RODGERS, Presiding Justice.
This is an appeal from the Chancery Court of Washington County, Mississippi, in which a decree was entered in favor of complainants, appellees, cancelling certain instruments on record in the office of the clerk of said court. The complainants claimed certain property under a parol gift from their deceased uncle. The decree cancelled a deed of trust made for the benefit of the deceased uncle and-cancelled a trustee’s deed in favor of appellant, Katie McLean.
*248 Appellee, Frances A. Green is a niece of A. L. Lucas, deceased. Mr. Lucas died on January 8, 1968; he never married. He made a will leaving his entire estate, valued at approximately $218,000 and including a barbecue place of business, to his Negro mistress, Katie McLean, who is one of the appellants. The other appellant, J. W. Kellum, is the attorney who was the substituted trustee in an attempted substitution of trustee and foreclosure sale of the property upon which Mr. Lucas held a deed of trust from appellees, Frances A. Green and John R. Green. On July 31, 1958, Mr. Lucas made a loan to the Greens in the amount of $16,500.00 to buy a home. Appellees signed a promissory note for the above amount payable to “A. L. Lucas, or order” payable in monthly installments of $130.49, commencing on September 1, 1958, and ending August 1, 1973. Appellees made a total of 22 payments from August 1958 through June 1961, after which time no further payments were made. Mr. Lucas’s attorney, Norman C. Brewer, testified about Mr. Lucas’s custom of dealing with delinquent tenants. According to Mr. Brewer, Mr. Lucas was very intolerant toward delinquent tenants; he would have them evicted promptly.
Mr. Lucas’s accountant Hugh Middleton, a certified public accountant and executor of Mr. Lucas’ estate, testified that, when he questioned Mr. Lucas about there being no interest income on the note in 1962, Mr. Lucas told him that there would not be any because it had been “squared away”.
Mrs. Bobby Lucas Lansdale, Mrs. Frances Green’s sister, testified that Mr. Lucas, her uncle, told her in the presence of appellant Katie McLean that he had given the property to appellees. Mrs. Lansdale testified that Mr. Lucas had an affection for appellee, Mrs. Frances Green, and that she would visit him for several days or a week at a time before her marriage. She further testified that Mr. Lucas would visit appellees when his store was closed and that appellees would visit him at Christmas time.
Mr. Middleton McGarah, stepfather to Mrs. Frances Green, testified that Mr. Lucas told him that he had given the property to appellee. Mr. McGarah testified that the reasons given by Mr. Lucas for the gift were, (1) that he did not need the money, (2) that it was her part, and (3) that he had never helped his twin brother (appellee’s father) but that he could help the kids.
Mr. Guy Neal, a personal friend of ap-pellees, testified that Mr. Lucas told him that he had given them “all the properties.” Mrs. Frances Green testified that Katie McLean admitted knowledge of the gift when she told appellee after Mr. Lucas’ funeral : “Miss Frances, you know your uncle left me everything he had, but you know you already have yours.” Immediately after Mr. Lucas’ funeral on January 10, 1968, Katie McLean attempted to give appellees the original note and deed of trust; but, because they were in a rush, appellees would not take them. However, several days later, on January 16, 1968, Katie McLean had her assistant Edna Haas mail the papers to appellees.
Appellees testified that prior to Mr. Lucas’ death he called them over to his house and, in the presence of Katie McLean, told them of his affair with Katie McLean and his intention to leave everything to her since appellees already had their money in the property which he had given them.
The Honorable Norman C. Brewer, Mr. Lucas’ attorney and drafter of the note and deed of trust in question, testified that Mr. Lucas had him draft two wills, one in 1958 and one in late 1967. According to Mr. Brewer’s testimony the reason Mr. Lucas gave everything to Katie McLean in his second will was because he had already made provisions for his nieces and nephews. Mr. Brewer testified that Mr. Lucas mentioned his gift to appellees as an example of the provisions already made for his nieces and nephews. He said that he had already given them what they owed him.
*249 In July or August of 1969, appellees requested Katie McLean to cancel the deed of trust on record. It was at that time that Katie McLean substituted J. W. Kel-lum, an attorney, as trustee and the attempted foreclosure and sale ensued. Ap-pellees brought suit to have the substitution, foreclosure and sale declared void and the deed of trust removed as a cloud upon their title to the property.
Appellant contends that the decree of the lower court is contrary to the law and evidence in that the alleged inter vivos gift was never perfected.
Appellees contend (1) that this Court must accept the evidence which supports or reasonably tends to support the Chancellor’s findings, as well as all inferences favorable to such findings which may be drawn from it; (2) that delivery of the promissory note and deed of trust after Mr. Lucas’ death was sufficient to perfect his renunciation; (3) that appellant, Katie McLean, having accepted the benefits of Mr. Lucas’ will is estopped from upsetting provisions made for Mr. Lucas’ blood kin during his lifetime; and (4) that since appellants were not “holders” of the promissory note, the attempted substitution of J. W. Kellum as trustee and the attempted foreclosure were ineffective.
A study of the law applicable to the facts in this case impels us to bypass the various contentions of the parties and move directly to the heart of the issue involved.
There is no question from this record but that A. L. Lucas thought that he had given his niece Mrs. Green the debt due him. He obviously intended to give her “the property.” Did he do the acts required to carry into effect his intent to make a gift? We must hold that he did not for the following reasons.
A gift made during the life of a person is called a gift inter vivos and imparts a gift between the living. 38 C.J.S. Gifts § 3, p. 781 (1943).
There are certain legal requirements necessary to constitute a gift inter vivos. There must be a donor competent to make a gift, a free and voluntary act on his part done with the intention to make a gift; the gift must be complete with nothing left to be done; the property must be delivered by the donor, and accepted by the donee; the gift must be gratuitous; and the gift must be irrevocable. Petersen v. Petersen, 238 Miss. 190, 118 So.2d 300 (1960), citing 38 C.J.S. Gifts § 10, p. 786 (1943). Maier v. Hill, 221 Miss. 120, 72 So.2d 209 (1954); Allison v. Allison, 203 Miss. 20, 33 So.2d 619 (1948); McClellan v. McCauley, 158 Miss. 456, 130 So. 145 (1930).
A statement of the rule leaves no alternative under the facts in this case; the gift was not completed, because the gift was not delivered to the donee during the life of the donor and was, therefore, not a gift inter vivos.
On the other hand, we are convinced that the Chancellor was correct in cancel-ling the instruments for the following reasons.
The record reveals that Katie McLean was not only familiar with the business of A. L. Lucas, but, in fact, she operated the business. She knew that Mr. Lucas changed his will in her favor, and she knew that he thought he had given his niece Mrs. Green the debt due to him by his niece and her husband.
After his death, she became the owner of all of his property subject only to his debts and the taxes due on his estate. She had the note and trust deed of the Greens in her possession after the death of A. L. Lucas, and she delivered these instruments to the Greens because she knew Mr. Lucas wanted to give the property to his niece. She acted for the sole purpose of giving to the Greens their interest in the estate of their uncle A. L. Lucas. In our opinion she renounced any claim she had to the note made by the Greens and payable to A. L. Lucas or order.
*250 The renunciation.of this note was done at a time before the enactment of the uniform commercial code and at a time when the uniform negotiable instruments law was in effect and controlling such matters as bills and notes. Under the negotiable instruments law of the Mississippi Code 1942 Annotated (1956) we find two sections pertinent to the question now before this Court. They are :
“ § 160. Instrument — how discharged.
A negotiable instrument is discharged:

(5) When the principal debtor becomes the holder of the instrument at or after maturity in his own right.”
“ § 163. Renunciation by holder.
The holder may expressly renounce his rights against any party to the instrument, before, at or after its maturity. An absolute and unconditional renunciation of his rights against the principal debtor made at or after the maturity of the instrument discharges the instrument. But a renunciation does not affect the rights of a holder in due course without notice. A renunciation must be in writing, unless the instrument is delivered up to the person primarily liable thereon.”
It should be at once pointed out that we are dealing with a negotiable instrument which came into the possession of the maker before maturity. That part of Section 160, Mississippi Code 1942 Annotated (1956) quoted above deals with a principal debtor who has become the holder in his own right “at or after maturity.” In the case of McCaslin v. Willis, 197 Miss. 366, 19 So.2d 751, 156 A.L.R. 770 (1944), this Court said that possession of a negotiable instrument after its maturity gives rise to a presumption of payment or discharge but that possession prior to its maturity does not give rise to such presumption. See the cases cited therein and also Hamilton v. Bethel, 256 Iowa 1357, 131 N.W.2d 445 (1964).
Section 163, Mississippi Code 1942 Annotated (1956) deals with renunciation of negotiable instruments. In the case of Hazlehurst Oil Mill & Fertilizer Co. v. Booze, 160 Miss. 136, 133 So. 120 (1931), this Court interpreted this section as follows:
“The history of the section seems to indicate that the word ‘renounce’ therein means ‘release without consideration.’ ” 160 Miss, at 139, 133 So. at 121.
This Court has held that a note can be the subject of a gift. Harmon v. McFarlane, 135 Miss. 284, 99 So. 566 (1924). See also Burke v. Coons, 136 So.2d 235 (Fla.1961); Stewart v. Hidden, 13 Minn. 43 (1868).
As can be seen from Section 163, supra, a renunciation must be in writing or it must be delivered up to the person primarily liable thereon. Some of the cases holding that the negotiable instrument is can-celled or discharged upon delivery to the maker or obligor are: Hamilton v. Bethel, 256 Iowa 1357, 131 N.W.2d 445 (1964); Burke v. Coons, 136 So.2d 235 (Fla.1961); Miller v. Miller, 296 S.W.2d 684 (Ky. 1956); Farmer v. Farmer, 195 Va. 92, 77 S.E.2d 415 (1953); Whitehead v. Planters Bank & Trust Co., 180 Va. 76, 21 S.E.2d 724 (1942); Northern Drug Co. v. Abbett, 205 Minn. 65, 284 N.W. 881, 121 A.L.R. 1349 (1939); Gerard v. Bank of N. Y. & Trust Co., 265 N.Y. 336, 193 N.E. 165 (1934); Gannon v. Bronston, 246 Ky. 612, 55 S.W.2d 358 (1932); Stewart v. Hidden, 13 Minn. 43 (1868). See 10 C.J.S. Bills and Notes §§ 474 and 475 (1938).
We believe that the delivery of the note by Katie McLean’s associate, pursuant to Katie McLean’s instructions, coupled with the statement by Katie McLean on the day of Mr. Lucas’ funeral that appellee already had her portion of the estate constituted express renunciation of the note. When the note was delivered prior to maturity and the express renunciation was made, the debt was discharged under the first sentence of Section 163, Mississippi Code 1942 Annotated (1956). This is *251 true, even though the renunciation was oral, because the oral renunciation was accompanied by delivery of the note to the principal debtor. This is in accord with the ruling in the case of Abraham v. Mike, 178 Okl. 597, 598, 63 P.2d 743, 745 (1936) wherein the Supreme Court of Oklahoma said:
“Plaintiff herein urges that the statute requires a renunciation to be in writing. This is true unless, as pleaded in the case at bar, the instrument is delivered up to the person primarily liable thereon. Saab v. Clawson, 138 Okl. 126, 280 P. 598, establishes the rule in this state that such renunciation may be proved by pa-rol testimony where, as alleged in the case at bar, the note has been surrendered and delivered to the principal debt- or. Daniel on Negotiable Instruments (6th Ed.) par. 1288, lays down the rule thus: ‘If the holder of a bill or note renounces his claim and gives up the instrument, the drawer and indorsers are as much discharged as by payment and he cannot sue the maker or makers on it.’
“That a renunciation may be gratuitous is held by numerous authorities, including Gannon v. Bronston, 246 Ky. 612, 55 S.W. (2d) 358, 86 A.L.R. 324.”
We hold, therefore, that the renunciation of the note discharged the maker as much as if it had been paid. For this reason the note was extinguished under Section 873, Mississippi Code 1942 Annotated (1956) which, at the time of the renunciation, read as follows:
“Payment of the money secured by any mortgage or deed of trust shall extinguish it, and revest the title in the mortgagor as effectually as if recon-veyed.”
With the debt extinguished, Section 876, Mississippi Code 1942 Annotated (1956) requires:
“Any mortgagee or cestui que trust, or assignee of any mortgagee or cestui que trust, of real or personal estate, having received full payment of the money due by the mortgage or deed of trust, shall enter satisfaction upon the margin of the record of the mortgage or deed of trust, . . .”
For the foregoing reasons we hold that the Chancellor was correct in cancelling the deed of trust and trustee’s deed and the appellees are hereby discharged of liability on the promissory note.
Affirmed.
BRADY, PATTERSON, SMITH and SUGG, JJ., concur.