# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 95-CA-00954-SCT

*CHARLES EVERETTE HANKINS*

*v.*

*SHERRY GAY GOODSON HANKINS*

### ON MOTION FOR REHEARING

| | |
|---|---|
| DATE OF JUDGMENT: | 08/18/95 |
| TRIAL JUDGE: | HON. MELVIN McCLURE |
| COURT FROM WHICH APPEALED: | GRENADA COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | A.E. HARLOW, SR. |
| ATTORNEY FOR APPELLEE: | LUTHER PUTNAM CRULL, JR. |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED IN PART; REVERSED IN PART AND REMANDED - 1/28/99 |
| MOTION FOR REHEARING FILED: | 8/14/97 |
| MANDATE ISSUED: | 4/12/99 |

**EN BANC.**

**BANKS, JUSTICE, FOR THE COURT:**

¶1. The motion for rehearing is granted. The original opinions are withdrawn and these opinions are substituted therefor.

¶2. In this matter we have for review a Judgment of the Grenada County Chancery Court, which granted a divorce to the appellee on the grounds of habitual cruel and inhuman treatment and which granted appellee an equitable division of property, periodic alimony, child support and a percentage of her attorney's fees. We agree with the chancellor's determination as to what property was subject to equitable distribution, and the award of alimony and child support. However, we find that the chancellor erred in calculating the value of the martial property distributed and in awarding attorney's fees and expenses. Accordingly, we reverse the judgment and remand for further proceedings.

## I.

¶3. Charles and Sherry Hankins were married September 9, 1978. They had two children, Charles, Jr., age 15, and Lana, age 10. The Hankinses lived together as husband and wife until about August 9, 1994 when they separated in Grenada County. Sherry quit her job after the wedding at Charlie's insistence that she

become a homemaker because it was costing him money for her to work. She thereafter stayed home as primary care giver to the children and as caretaker of the home. She had subsequently gone back to nursing school where she had a year remaining until graduation at the time of the hearing.

¶4. Charlie worked full-time in his father's lumber company, where he regularly earned over $100,000 per year, and was periodically given shares of stock in the lumber business. Prior to the marriage, Charlie owned 11 shares of stock. During the marriage, Charlie was given another 57 and one-half shares of stock. Burton Hankins, Charlie's father, stated that he did not give the stock to his children for work done in the family business, but did not issue any shares to any family member who did not work in the family business. In 1994, Charlie left the business and was unemployed for several months thereafter. He has since started a timber business, but was considered by the chancellor to have zero adjusted gross income at the time that the divorce was entered. Charlie ultimately sold his shares of stock in the business back to his father for $700,000.

¶5. Charlie drank either beer or whiskey nearly every day. He spent most nights in the den of the home drinking until he became intoxicated. At that point he would become verbally abusive to his family, and sometimes physically abusive to Sherry. Charlie also had an affair in the waning months of the marriage prior to the separation with one Wanda Causey. At the time of the hearing, Charlie and Wanda were living together.

¶6. The chancellor found that Charlie had committed adultery, habitual cruel and inhuman treatment, and habitual drunkenness. However, out of concern for the children, the chancellor consolidated these claims, granting Sherry a divorce on the grounds of habitual cruel and inhuman treatment.

¶7. The chancellor then divided the property. Specifically, the chancellor held that Charlie was entitled to the eleven shares of stock that he possessed prior to the marriage, and valued those shares at $70,000, based upon the purchase price of $700,000 for all of Charlie's stock that was sold back to the company. He awarded Sherry the property that she had inherited from her grandfather. Title in the home was vested in Sherry and divested from Charlie. Charlie was ordered to pay $39,000 in debt and an estimated $189,000 in taxes on the distribution of the stocks, plus an additional $77,000 in taxes which had already been paid.

¶8. The chancellor valued the house at $85,000, subtracted Charlie's $5,000 of equity and awarded the house to Sherry. The chancellor then valued the stock at $700,000, its selling price, and subtracted the $70,000 attributed to Charlie's premarital property, arriving at a value of $630,000 for the marital stock. From this figure, he subtracted the $266,000 in taxes, less $27,000 in taxes on Charlie's $70,000 worth of stock. The chancellor then subtracted the $39,000 in debts which he ordered Charlie to pay. The chancellor then added in the value of the house less Charlie's $5,000 in equity. According to the chancellor's calculations, the net to be distributed was $432,000 which he divided by two, to get a figure of $216,000 which he rounded down in favor of Charlie to $210,000. He then awarded Sherry a cash equitable distribution of $210,000, separately and in addition to the marital home. The chancellor went on to award Sherry 80% of her attorney's fees and expenses for a total of $5,888. Aggrieved, Charlie appealed the chancellor's judgment.

## II.

¶9. Our scope of review in domestic relations matters is limited. "This Court will not disturb the findings of

a chancellor unless the chancellor was manifestly wrong, clearly erroneous or an erroneous legal standard was applied.'" *Ferguson v. Ferguson,* 639 So. 2d 921, 930 (Miss. 1994) (quoting *Bell v. Parker*, 563 So. 2d 594, 596-97 (Miss. 1990)). This is particularly true "'in the areas of divorce and child support.'" *Ferguson*, 693 So. 2d at 930 (quoting *Nichols v. Tedder*, 547 So. 2d 766, 781 (Miss. 1989)).

### A.

¶10. In his first assertion of error, Charlie encourages this Court to overrule *Ferguson* and abandon the concept of equitable division of property and wait for legislative direction. Charlie claims alternatively, that *Ferguson* should apply only prospectively. In *Ferguson* this Court found implicit statutory authority to equitably divide property from Miss. Code Ann. § 93-5-23 wherein it stated:

> When a divorce shall be decreed from the bonds of matrimony, the court may, in its discretion, having regard to the circumstances of the parties and the nature of the case, as may seem equitable and just, make all orders . . . touching the maintenance and alimony of the wife or husband, or any allowance to be made to her or him . . .

*Ferguson*, 639 So. 2d at 927. The Legislature has, to this point, not seen the need to "correct" this Court's pronouncement in *Ferguson* by passing any legislation which would undo the decision. Neither is it readily apparent that *Ferguson* has turned the area of divorce law on its ear, wreaked havoc on the system, or ruined it beyond repair.

¶11. Further, Charlie has cited no law, from this jurisdiction or any other, which supports the proposition that this Court should do away with the concept of equitable division of property. This Court has stated that it need not consider argument which is not supported by authority. *Grey v. Grey,* 638 So. 2d 488, 491 (Miss. 1994). Accordingly, it is not necessary to consider this issue. Neither does Charlie cite any authority to support the proposition that Ferguson should apply only prospectively. Therefore under *Grey* it is not necessary to address that point either.

¶12. We also note that Charlie similarly failed to support his argument with authority as it concerns the issues of *de novo* review of division of property orders, and child support. We will not consider those issues for the same reason. And as a result we find that the issues of propriety of equitable division, standard of review, and child support, are without merit.

### B.

¶13. Charlie also raises the issue of whether the chancellor erred by granting Sherry 80% of her attorney's fees and other court costs. Charlie argues that Sherry could pay her own court costs and attorney's fees given the amount of the property settlement. A trial court abuses its discretion by awarding attorney's fees without first finding that the party is unable to pay the fees. *See Overstreet v. Overstreet*, 692 So. 2d 88, 92-93 (Miss. 1997); *Creekmore v. Creekmore*, 651 So. 2d 513, 520 (Miss. 1995); *Gambrell v. Gambrell*, 650 So. 2d 517, 521 (Miss. 1995); *Martin v. Martin*, 566 So. 2d 704, 707 (Miss. 1990); *Cheatham v. Cheatham*, 537 So. 2d 435, 440 (Miss. 1988). Here Sherry was awarded the house and $210,000 in cash. However, the chancellor made no determination as to whether Sherry was able to pay her attorney's fees or the court costs or otherwise explored this award in relation to equitable distribution. Therefore, we reverse and remand as to the award of attorney's fees.

### C.

¶14. Charlie raises the issue of whether the chancellor erred by improperly excluding commingled property from equitable distribution, while including otherwise exempt property. Specifically, Charlie alleges that the chancellor should not have included his stocks in the distribution, as these were *inter vivos* gifts from Charlie's father, but that the chancellor should have included Sherry's 55 acres which she had inherited from her grandfather, because Charlie had planted trees on the land, thereby making it commingled property. Charlie also objects to the chancellor's awarding the marital home to Sherry.

### 1. Sherry's Property

¶15. It is true that Charlie planted trees on land that Sherry inherited from her grandfather, but there is no testimony in the record as to the value of the trees, the extent of the planting, or that there was any agreement between Charlie and Sherry that Charlie's act of planting the trees would thereby give him an interest in the property. We therefore find that the chancellor was not manifestly wrong or clearly erroneous in finding that Sherry's property retained its character as an inheritance not subject to equitable distribution.

### 2. Charlie's Stock Certificates

¶16. These certificates are what this case really is all about, since there would be little else to equitably divide if Charlie did not have possession of these certificates to sell back to his father's company. Charlie suggests that the stock was not subject to equitable division because the stock represented a series of *inter vivos* gifts from his father, with which he was periodically presented.

¶17. In order to meet the requirements of an *inter vivos* gift, several requirements must be met: (1) there must be a donor competent to make the gift; (2) the gift must be a free and voluntary act on his part done with the intention to make a gift; (3) the gift must be complete with nothing left to be done; (4) the property must be delivered by the donor, and accepted by the donee; (5) the gift must be gratuitous; (6) the gift must be irrevocable. ***McLean v. Green***, 258 So. 2d 247, 249 (Miss. 1972). Of particular interest is requirement number (5). It is not clear that this gift was gratuitous in that Charlie was an employee of the lumber company. Although Burton Hankins stated that his reason for giving the stock had nothing to do with the fact that Charlie worked at the lumber company, his testimony was also that Charlie was one of four people to whom he had distributed stock. The other three were two of Charlie's brothers and one of Burton Hankins's nephews, all of whom worked for Hankins Lumber Company at the time that they received their stock. Thus, we cannot say that the stock was either a gift, given gratuitously, or was in consideration of work done at the lumber company.

¶18. However, in ***Hemsley v. Hemsley***, 639 So. 2d 909, 915 (Miss. 1994), this Court held that marital property was defined as any and all property acquired or accumulated during the marriage. The ***Hemsley*** Court went further to state that such assets are subject to equitable distribution by the chancellor. ***Id.*** The Court also quoted approvingly from the opinion of the chancellor in that case where he stated:

> The Court feels that it would be grossly unfair to allow the defendant to divorce his wife and either remarry or allow some other woman to reap the benefits of the plan acquired during the best years of their life. He should not live in comfort while the ex-spouse becomes destitute. . .

***Id.*** at 914. Likewise, in this case, it would be grossly unfair to allow Charlie to reap the benefits of his stock certificate proceeds, acquired during the marriage while he worked and Sherry was, at his insistence, a homemaker and primary care giver to the children, by allowing him to characterize the stock as *inter vivos*

gifts. The evidence does not clearly establish that these certificates were gifts or remuneration for service given to the lumber company. Therefore, we find that the chancellor was not manifestly wrong or clearly erroneous in including the 57 and one-half shares of stock which were acquired during the marriage as part of the marital estate.

### 3. The House

¶19. The only other asset which provides a major bone of contention from Charlie is the marital home, valued at $85,000 by the chancellor, and awarded to Sherry. However, the chancellor gave Charlie credit for $5,000 in equity which he had paid into the home prior to the marriage. Further, it is the general rule that it is better to award the marital residence to the party who is given custody of the children. *Moak v. Moak*, 631 So. 2d 196, 198 (Miss. 1994).

¶20. Charlie further insists that the chancellor did not follow the Ferguson Guidelines in equitably distributing property. Charlie goes so far as to say that had this been done, then surely the value of Sherry's services as a homemaker are worth no more than minimum wage. Such a valuation on the contribution of a homemaker was expressly outlawed in *Hemsley* wherein the Court stated:

> If the breadwinner happens to be the husband and has all the property in his name, this serves to relegate the non-breadwinner wife to the equivalent of a maid--and upon division of the marital estate entitled to a minimum wage credit for her homemaking service. We abandon such an approach.
>
> We, today, recognize that marital partners can be equal contributors whether or not they both are at work in the marketplace.

*Hemsley*, 639 So. 2d at 915.

¶21. At other points in the brief, Charlie claims that other *Ferguson* factors are irrelevant to the analysis of equitable division where they clearly would not fall in his favor. An analysis of the*Ferguson* factors clearly would work in Sherry's favor, and the judge had all the evidence in the record to find as he did. Consequently, we find this issue to be without merit.

### D.

¶22. Charlie also claims that the chancellor committed reversible error in the division of the total assets and liabilities of the parties. The chancellor calculated the net marital assets to be distributed as $432,000 which he divided by two, to get a figure of $216,000 which he rounded down in favor of Charlie to $210,000. He then awarded Sherry a cash equitable distribution of $210,000 in addition to the marital home. Hence the chancellor's expressed intent appears to be that Charlie retain $222,000 of the net marital assets, while Sherry retains $210,000. However, under the terms of the Opinion Sherry was actually awarded $290,000 (the cash distribution and the value of the house), while Charlie actually retained $142,000.

¶23. The discrepancy between what the chancellor purported to do and what was actually done resulted from two material miscalculations. First, the taxes attributable to Charlie's premarital stock property were miscalculated. The chancellor held that Charlie was entitled to 11 shares of the 68.5 shares of stock, as premarital property. Charlie makes the obvious point that 11 shares is more than 10% of 68.5 shares. The value of Charlie's 11 shares should have been $122,000 rather than $70,000. However, the chancellor was given a net figure, after taxes of $69,000 which was rounded to $70,000. The problem is that when the

chancellor rendered judgment effect was once again given to the taxes. The chancellor figured that $70,000 was ten percent of $700,000 and attributed ten percent of the taxes, $266,000 rounded to $27,000 to that stock. The result is that $391,000 was included as the value of the martial assets from the stock when it should have been $364,000.

¶24. Second, the chancellor included the net value of the house in calculating the martial assets, in spite of the fact that Sherry was awarded the house separate from and in addition to the distribution of the marital assets. This resulted in Sherry being awarded $290,000 as opposed to $210,000 as stated in the chancellor's opinion. Thus, the discrepancies between the express intent of the chancellor and the actual distribution dictate that this matter be remanded to the trial court for reconsideration on the issue of the equitable distribution of the marital assets.

## III.

¶25. For the foregoing reasons we reverse the judgment of the chancery court with respect to equitable division and attorneys fees and remand to that court for further proceedings consistent with this opinion.

¶26. **JUDGMENT IS AFFIRMED IN PART AND REVERSED IN PART AND REMANDED FOR FURTHER PROCEEDINGS.**

**PRATHER, C.J., SULLIVAN AND PITTMAN, P.JJ., ROBERTS AND SMITH, JJ., CONCUR. McRAE, J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION. MILLS AND WALLER, JJ., NOT PARTICIPATING.**