33 So.3d 1169 (2009)
Christopher LAGARDE and Elizabeth Bosarge, Appellants,
v.
Alan LAGARDE and Lisa Lagarde, Appellees.
No. 2008-CA-01480-COA.
Court of Appeals of Mississippi.
December 15, 2009.
Rehearing Denied May 4, 2010.
*1170 Clement S. Benvenutti, Louis, attorney for appellants.
Timothy Lee Murr, Gulfport, attorney for appellees.
EN BANC.
IRVING, J., for the Court.
¶ 1. This appeal arises out of a complaint for specific performance filed by Alan and Lisa Lagarde against the Estate of Mary Lagarde in the Hancock County Chancery Court. The chancery court found that a contract entered into by Mary's son, Alan, and his wife, Lisa, to purchase a home from Mary was valid, as to its original terms, and that a gift of equity given to Alan and Lisa by Mary constituted an inter vivos gift and survived Mary's death. Feeling aggrieved, two of Mary's other children, Christopher Lagarde and Elizabeth Lagarde Bosage, appeal and assert: (1) that the chancellor used an improper legal standard and erred in finding that the gift of equity survived Mary's death, (2) that the chancellor erred in finding that the gift of equity, given in the form of a letter, was symbolically delivered by Mary, (3) that the chancellor erred in finding that the gift equity letter became a valid and complete gift, (4) that the chancellor erred in granting specific performance, and (5) that the chancellor erred in awarding attorney's fees to Alan and Lisa.
¶ 2. We affirm the chancellor's judgment as it relates to the enforceability of the original contract. However, because we find that there was no delivery of the gift of equity to Alan and Lisa during Mary's lifetime, we reverse and render the chancellor's finding that Mary symbolically delivered $50,000 in equity to Alan and Lisa. Further, we reverse and remand for a determination of whether Alan and Lisa are prepared to purchase the home for the $250,000 purchase price as set forth in the original contract and without the benefit of the $50,000 gift of equity. We also reverse and render the chancellor's award of attorney's fees to Alan and Lisa.

FACTS
¶ 3. On July 28, 1958, Mary and her husband, Frank W. Lagarde, purchased a home located at 237 St. Charles Avenue in Bay St. Louis, Mississippi. Mary and Frank raised their nine childrenKevin, *1171 Frank Jr., Jules, Melissa, Robert, Alan, Christopher, Elizabeth, and Maryin the home. Frank died in 1991, leaving Mary the sole owner of the residence. In 1994, Mary executed a holographic will. Pursuant to the terms of the will, Kevin, Christopher, and Elizabeth were to receive the family residence.
¶ 4. On October 24, 2003, Mary, concerned about her ability to properly manage the upkeep of the residence, wrote a letter to all of her children asking for guidance in this regard. Mary's letter reads, in pertinent part, as follows:
I can see in the future I will be making some ... decisions such as: Will I stay in the house? Will I sell it? Will I bring in another lady to share the house with me? Will I bring in a small family to share the house? All of these things have been suggested and I'm hoping that whatever decision I make, it will be right.
I ask that each of you answer me in writing so I will know how you feel about all of the above.... PLEASE ANSWER ME AND GIVE ME YOUR IDEAS, FEELINGS AND SUGGESTIONS.

Thereafter, on November 6, 2003, Mary obtained a home-equity line of credit from Keesler Federal Credit Union (Keesler) in order to repair and renovate the residence. Then, in July 2004, Alan and his wife, Lisa, expressed interest in purchasing the family residence from Mary. An appraisal was ordered on July 19, 2004, which revealed that the house was worth $290,000.
¶ 5. On October 8, 2004, Alan, Lisa, and Mary entered into a written contract to sell the home to Alan and Lisa for $250,000. Closing was set for October 30, 2004. However, the closing was subsequently rescheduled. On November 9, 2004, Mary executed an instrument entitled "Gift Equity Letter" to Alan and Lisa, which reads as follows:
I, Mary C. Lagarde, do hereby certify the following:
a.) I am making a gift of equity, $50,000, to Alan & Lisa Lagarde. Whose relationship is: Mary is the mother of Alan Lagarde.
b.) This gift is to be applied towards the purchase of the property located at 237 St. Charles Street, Bay St. Louis, Mississippi 39520.
c.) No payment of the gift is expected or implied in the form of cash or by the future services of the recipient.
d.) The source of the gift is gift equity at the time of closing & funding for same subject property.
Two additional appraisals were conducted, one on December 1, 2004, and another on December 30, 2004. The house appraised for $257,000 on December 1, and $290,000 on December 30.
¶ 6. Mary died unexpectedly on January 11, 2005; therefore, the closing did not occur. Sometime after the execution of the contract and gift equity letter, handwritten changes were made to both documents. Specifically, the $250,000 purchase price listed on the contract was stricken through, and $256,000 was written in its place. Further, "$51,200" was handwritten on the contract to reflect the amount of the "cash down payment at closing." Under the section that pertains to the closing costs, the contract has an "S" and a "B," which represents seller and buyer, to the immediate left of the following provision: "Pays all other closing costs associated with this loan, including any inspections that lender requires." The "S," is circled and "$4,100" is written next to this provision. Also, on the gift equity letter, the $50,000 figure listed to reflect the amount of equity that Mary was conveying to Alan and Lisa, was stricken through and "$51,200" *1172 was handwritten in its place. The record does not contain the original contract or the original gift equity letter or a copy of either document.[1] Further, we note that there is a circle divided into four sections next to each of the handwritten changes. The initials "LL" are in the top right portion of the circle, and the initials "AL" are in the bottom right portion of the circle. Neither Mary's initials or signature appear next to any of the changes made to either document.
¶ 7. Kevin, Christopher, and Elizabeth filed a petition to probate the will. On July 24, 2006, they were appointed as tri-executors of the estate. On September 15, 2006, Alan and Lisa filed a complaint for specific performance in chancery court, seeking to enforce the sale of the family residence. On January 7, 2007, Alan and Lisa filed an amended complaint. Christopher and Elizabeth filed an answer to the amended complaint on June 20, 2007, and asserted the following affirmative defenses: (1) that Alan and Lisa's claims were barred by the statute of frauds, (2) that the contract had terminated by its own terms and conditions, (3) that the contract and gift of equity are the product of undue influence, (4) that the contract fails for lack of consideration, and (5) that the doctrines of waiver and estoppel bar Alan and Lisa from bringing their claim.
¶ 8. The chancery court heard the matter on August 27, 2007. All nine of Mary's children testified at trial, and each stated that, even though she was eighty-one years old, Mary had no problem thinking and making decisions for herself and was active in her church and community. They acknowledged that Mary used a reading machine that magnified documents so that she could read them, that she was legally blind, and that she had a congenital heart problem. However, their testimonies remained consistent that Mary was very "sharp" during the last months of her life.
¶ 9. Alan testified that Mary had agreed to the changes and had planned to sign off on them at closing but that she died before she got the opportunity to do so. According to Alan, they all agreed to delay the closing per Mary's request. According to Alan, Mary wanted to reschedule the closing date of October 30, 2004, to avoid having to reimburse Keesler for the closing costs of the Keesler loan.[2] He also stated that Mary wanted to wait until after the holidays to settle the matter.
¶ 10. Alan also testified that, although not contained in the contract or the gift equity letter, he and Lisa had made an agreement with Mary that they would allow Mary to continue to live in the residence for the remainder of her life after they purchased the home. Alan testified that Mary registered no objection to closing outside of the October 30, 2004, closing deadline provided for in the contract and made no attempt to cancel or void the contract prior to her death.
¶ 11. The Lagarde family held a meeting the week after Mary's death, and according to Alan, it was at this point that he informed all of his siblings that he and Lisa had entered into a contract with Mary to purchase the family residence. Alan testified that no one objected to his and Lisa's purchase of the residence at that *1173 time. He stated that Christopher mentioned that he wanted to receive more of the proceeds of the sale. Although he initially expressed concern, Kevin agreed that the contract for the sale of Mary's home should be enforced. With the exception of Christopher and Elizabeth, none of the other siblings objected to the enforcement of the contract and gift equity letter.
¶ 12. After considering all of the evidence before him, the chancellor found that the contract, as originally written, was valid and enforceable. The chancellor also found that Alan and Lisa failed to show consideration for the changes that were made to the contract and to the gift equity letter and found them unenforceable. The chancellor further found that Mary symbolically delivered the $50,000 gift of equity to Alan and Lisa. Also, the chancellor awarded Alan and Lisa eighty percent of their attorney's fees that they had incurred to enforce the contract.
¶ 13. Additional facts, as necessary, will be related during our analysis and discussion of the issues.

ANALYSIS AND DISCUSSION OF THE ISSUES
¶ 14. "A chancellor's findings of fact will not be disturbed unless manifestly wrong or clearly erroneous." Sanderson v. Sanderson, 824 So.2d 623, 625-26 (¶ 8) (Miss.2002) (citing Consol. Pipe & Supply Co. v. Colter, 735 So.2d 958, 961 (¶ 13) (Miss.1999)). An appellate court will not "disturb the findings of a chancellor when supported by substantial evidence unless the chancellor abused his discretion, was manifestly wrong, clearly erroneous or an erroneous legal standard was applied." Id. (quoting Kilpatrick v. Kilpatrick, 732 So.2d 876, 880 (¶ 13) (Miss.1999)).

1. Gift of Equity
¶ 15. Christopher and Elizabeth contend that the chancellor erred in several respects as to his finding that Mary symbolically delivered the $50,000 gift of equity to Alan and Lisa. Specifically, they assert that the chancellor erred in finding that the gift of equity survived Mary's death and was validly and completely delivered to Alan and Lisa during Mary's lifetime. Christopher and Elizabeth cite Gilder v. First National Bank of Greenville, 214 So.2d 681 (Miss.1968) for the proposition that in order for a gift to be considered a valid inter vivos gift, "the property proposed to be transferred by gift must have been delivered so that the donor surrendered all dominion over it during her lifetime." In Mississippi, the requirements of a valid inter vivos gift are: (1) that the donor be capable of making the gift, (2) that the act is voluntary on the donor's part, (3) that the donor intends to make the gift, (4) that the gift is complete with nothing left to be done, (5) that the property be delivered by the donor and accepted by the donee, and (6) that the gift be gratuitous and irrevocable. Jenkins v. Jenkins, 278 So.2d 446, 449 (Miss.1973) (citing McLean v. Green, 258 So.2d 247, 249 (Miss.1972)).
¶ 16. Further, in Meyer v. Meyer, 106 Miss. 638, 64 So. 420, 424 (1914), our supreme court held that:
To constitute a valid gift inter vivos, the purpose of the donor to make the gift must be clearly and satisfactorily established, and the gift must be complete by actual, constructive, or symbolical delivery without power of revocation. 20 Cyc. 1193. "A mere promise or declaration of intention to give, however clear and positive, is not enough to constitute a valid gift inter vivos. The intention must be consummated, and carried into effect, by those acts which the law requires to divest the donor and invest the done [sic] with the right of property.

*1174 Complete and unconditional delivery is essential to the perfection of such a gift for when the donor retains dominion over the property, or where a locus poenitentiae remains in him, there can be no legal title and perfect donation, and this rule has been held particularly applicable to parol gifts, and is founded upon grounds of public policy and convenience, to prevent mistake, imposition, and perjury. Delivery to be effectual must be according to the nature and character of the thing given, and hence may be actual or constructive according to the circumstances. There must, however, be a parting by the donor with all present and future legal power and dominion over the property." 20 Cyc. 1195; Thompson v. Thompson, 3 Miss. 737, 2 How. 737; Wheatley v. Abbott, 32 Miss. 343; Conner v. Hull, 36 Miss. 424; Young v. Power, 41 Miss. 197; Carradine v. Collins, 15 Miss. 428, 7 Smedes & M. 428.
(Emphasis added).
¶ 17. Here, the chancellor concluded that Mary had symbolically delivered the gift of equity when she signed the gift equity letter on November 9, 2004. The chancellor stated the following:
The Gift Equity letter makes it clear that Mary Lagarde intended to give a gift of equity to Alan and Lisa. Equity is intangible and cannot be physically delivered from one party to another. The letter acted as the symbolic delivery of the equity from Mary Lagarde to Alan and Lisa. Since it was to be used as consideration in the sale of property, it was directly attached and became a part of the contract for the sale of land upon its delivery to Alan and Lisa. The contract to sell the property is enforceable and the remedy for breach is specific performance[;] therefore, Mary Lagarde relinquished all control over the equity when she delivered the Gift Equity Letter to Alan and Lisa. The Court finds the Gift Equity Letter was a valid and complete gift to Alan and Lisa and became part of the consideration for the contract.
¶ 18. We conclude that the gift equity letter did not survive Mary's death, as we, unlike the chancellor, find that Mary did not symbolically deliver the gift of equity. We find that, even though Mary gave Alan and Lisa the gift equity letter, she retained dominion and control over the equity, because she died before she completed the transfer of equity to Alan and Lisa. Therefore, relying on Meyer, we conclude that Mary's gift equity letter was more of a promise or declaration of her intention to give Alan and Lisa a gift of equity in the amount of $50,000, rather than a complete and unconditional delivery of the same. Alan and Lisa would have had no legal means of enforcing the terms of the gift equity letter had Mary decided to rescind her offer. Thus, we disagree with the chancellor's finding that "Mary Lagarde relinquished all control over the equity when she delivered the Gift Equity Letter to Alan and Lisa." The equity would have remained in Mary's control until she turned it over to Alan and Lisa at the closing. For the reasons presented, we reverse and render the chancellor's finding that the gift equity letter acted as symbolic delivery of the $50,000 in equity.

2. Specific Performance
¶ 19. Christopher and Elizabeth also contend that the chancellor erred in granting specific performance of the original contract. Christopher and Elizabeth argue that since the court found unenforceable the contract that Alan and Lisa were seeking to enforce, the chancellor essentially "created a new contract" and *1175 incorporated the gift equity letter into that "new contract."
¶ 20. As noted, the contract was executed on October 8, 2004, for a purchase price of $250,000. It is clear that, a little over a month later, Mary executed a gift equity letter wherein she agreed to give a gift of equity in the amount of $50,000 to Alan and Lisa to be used as a down payment to purchase the home. On the contract, "$51,200" is handwritten following the phrase "cash down payment at closing." The record does not contain a contract wherein $50,000 is listed to represent the amount of the down payment due at closing. Based on Alan's testimony on cross-examination, it is reasonable to conclude that a down payment of $50,000 was never listed in the contract that was signed by Mary. We quote the relevant portions of Alan's testimony below:
Q. Okay. What was the original amount in the figure at paragraph 1-a-excuse me, 2-a?
A. $250,000.
Q. I can see that. The line below that, 2-a.
A. Oh, I'm sorry. $51,200.
Q. That figure was changed, wasn't it.
A. From the Exhibit D?[3]
Q. Well, I don't know whether it was I mean, Ias far as I can tell, Exhibit D and this document are identical, and I'm trying to ask
A. It was not changed on this document. It was changed on the gift equity letter.
Q. Well, didn't you tell me that the figure in 2-a had been changed from another figure from when your mother originally signed the document?
A. No. I told you that in Exhibit J the gift equity amount had been changed from $50,000 to $51,200. It never did refer to the signed contract about that change, just about the gift equity letter.
Q. Well, isn't it true, sir, that the original contract on line 2-a would have called for $50,000 cash down at closing to correspond with the equity letter?
A. Are you referring to the equity letter, or are you referring to the contract?
Q. Well, I'm referring to both. Okay?
A. Restate your question, please.
Q. All right. Well, let's start with looking at the contract itself, paragraph 2, subparagraph A; not the equity letter now, the contract, agreement to purchase or sell.
A. Yes.
Q. All right. You see where it's handwritten?
A. $51,200.
Q. Yes, sir. And all of the other portions of the terms of the agreement when initially signed by your mother were typed, right, or printed from a computer?
A. Yes; uh-huh.
Q. And, in fact, the 2-a line was $50,000 when your mother signed it on October 8th, 2004?
A. On the copy that I have, it's $51,200.
Q. That's what's written there on that date, sir. And we've established that other portions of this contract had been signedhad been modified after October 8th, 2004, haven't we?
A. I believe so.

*1176 Q. Yes, sir. The $250,000 sales price changed to $256,00. Right?
A. That's a change, yes.
Q. Yes, sir. And then the $51,200 figure as a gift, that didn't existuntil your mortgage broker struck out that number and asked you to make the modification on it, rightor initial it?
A. I believe so.
Q. All right. So how could the gift on October 8th, 2004, be $51,200 when that figure didn't exist in anybody's mind?
A. If I'm not mistakenLet me just make sure here. Steve, on the copy that I have, December [sic] 8th, 2004, it's $51,200.
Q. Yes, sir.
A. So I don't know what you're trying to imply or trying to get at here. Looking atI think what you're doing is marryingtrying to marry two different documents
Q. Yes, sir.
A. an equity document and a signed contract that my wife and I had with my mother
Q. Yes, sir.
A. with the full knowledge of both Liz and Chris.
Q. All right. So it's your testimony under Aoath that on October 8th, 2004, line 2a had the figure of $51,200.
A. Line 2a of what document?
Q. On page 3 of Exhibit J, the document that's titled Agreement to Purchase or Sell.
A. To the best of my knowledge, $51,200 was on there. Yes, to the best of my knowledge.
Q. All right. So on October 8th
THE COURT: Did your mother sign Exhibit D in your presence?
THE WITNESS: The signed contract, Judge?
THE COURT: Yes.
THE WITNESS: Yes, sir.
[ATTORNEY FOR APPELLANTS]:
Q. So let me get this straight, Alan. This is your testimony. On or about November 15th 2004, Rob with Prime Lending faxed to you Exhibit J giving you instructions to initial two documents, right?
A. Correct.
Q. One was the contract, and one was the gift equity letter, right?
A. Yes.
Q. And on that date is when he made the changes to change the gift equity from $50,000 to $51,200, right?
A. That's what it appears to be, yes.
Q. All right. On about November 15th when he faxed this to you, right? So that would have been the date on which, at least from your perspective, your mother was now going to give you $51,200 as opposed to $50,000 before
A. That would be
Q. before that date?
A. It appears that way, yes.
Q. All right. So somehow or another before that date you never knew that your mother was going to give you $51,200 as a gift?
A. No, actually, we talked about that as early as October 1st because that's when she signed the gift equity letter. I'm sorry. That's when it was prepared. She signed it November 9th.
Q. November 9th, but the gift at that time was $50,000, not $51,200, right?
A. That's a difference of $1,200, yes.

*1177 Q. Well, regardless of the amount, it was a difference, right?
[ATTORNEY FOR APPELLEES]: Your Honor, he's asked this question about three times.
THE COURT: He's on cross-examination.
[ATTORNEY FOR APPELLEES]: Yes.
A. There was a change in the amount of gift equity.
[ATTORNEY FOR APPELLANTS]:
Q. And that change added $1,200, and that change occurred on November 15th, 2004, right?
A. Yes.
Q. But somehow mysteriously that figure did not exist before November 15th, 2004, but it was put on the original contract on November 8th, 2004 [sic]; that's your testimony?
A. The figure of $51,200 is on the signed contract dated October 8th.
Q. And it was on there when your mother signed the contract on November 8th, 2004 [sic]?
A. It's very possible that the lender And I don't know why he would have marked out the $50,000 and put in $51,200. Let's be real clearI'd like the Court to be real clear, the change on this is very, very minor, you know, like I said, $1,200.
¶ 21. Paragraph seventeen of the contract provides that:

This contract incorporates all prior agreements between parties, contains the entire and final agreement of the parties, and cannot be changed except by their written consent. Neither party shall be bound by any terms, conditions, oral statements, warranties, or representations not herein contained. Each party acknowledges that he has read and understands the contract. The provisions of this contract shall apply to bind the heirs, executors, administrators, successors and assigns of the respective parties hereto. When herein need, the singular includes the plural, the masculine includes the feminine, as the context may require.
(Emphasis added).
¶ 22. The chancellor enforced the contract as to its original terms and stated the following:
Although testimony was provided stating the parties mutually agreed to the modifications, Mary Lagarde never signed off on those modifications. The modified contract is silent as to what further consideration was given for the modifications to be valid. Since Mary Lagarde never signed the contract, there is no evidence the modifications were the result of any bargained for return promise. The Court finds Alan and Lisa failed to show consideration to support the modifications of the initial contract making the modifications unenforceable.
¶ 23. Despite Alan's testimony to the contrary, we find the evidence insufficient to support the conclusion that the handwritten insertion of $51,200 as the cash down payment was included in the contract when it was executed by Mary on October 8, 2004. In fact, there is no evidence that Mary agreed on October 8, 2004, to give Alan and Lisa $50,000 since the letter of gift equity was not executed until November 9, 2004. We also agree with the chancellor that Mary never agreed to the handwritten changes in writing as required by the contract and, therefore, cannot be enforced.
¶ 24. As stated, the chancellor found that the modified contract was unenforceable because Mary did not agree to *1178 the modifications in writing. However, the chancellor enforced the contract without the modifications. We find that the chancellor was correct in doing so, as the contract specifically provides that its provisions "shall apply to bind the heirs, executors, administrators, successors and assigns of the respective parties." Thus, on remand, if Alan and Lisa are prepared to purchase the family residence for $250,000 without the benefit of the $50,000 gift of equity, the chancellor shall order the estate to proceed with the sale.

3. Attorney's Fees
¶ 25. Christopher and Elizabeth assert that the chancellor erred in awarding attorney's fees against them. They contend that because Alan and Lisa did not prevail on the specific issue presented to the chancellorwhether the contract with the handwritten changes was enforceable they should not have been ordered to pay Alan and Lisa's attorney's fees. We agree.
¶ 26. It is well settled in Mississippi that "[i]n breach of contract cases, attorney['s] fees generally are not awarded absent provision for such in the contract or a finding of conduct so outrageous as to support an award of punitive damages." Garner v. Hickman, 733 So.2d 191, 198 (¶ 23) (Miss.1999) (citing Greenlee v. Mitchell, 607 So.2d 97, 108 (Miss.1992)).
¶ 27. The contract provides as follows under the provision entitled breach of contract: "If it becomes necessary to insure the performance of the conditions of this contract either party to initiate litigation,[sic] then the losing party agrees to pay reasonable attorney['s] fees and court costs in connection therewith." We conclude that because Alan and Lisa initiated litigation and did not prevail in their effort to get specific performance of the contract, as modified, they are not entitled to have Christopher and Elizabeth pay their attorney's fees. Accordingly, we reverse and render the chancellor's decision ordering Christopher and Elizabeth to pay Alan and Lisa's attorney's fees.
¶ 28. The separate opinion argues that we err by enforcing the original contract because it had expired at the time of Mary's death. It is obvious that the separate opinion means that the time specified for closing in the contract had expired, as the contract says nothing about its duration. We agree that the date specified in the contract had expired prior to Mary's death. However, it is not appropriate to end the analysis at this point.
¶ 29. When Mary executed the gift equity letter on November 9, 2004, the date specified in the contract had expired nine days earlier. The gift equity letter is signed by Mary and by both of the purchasers, Alan and Lisa. Clearly the execution of the letter, which was designed to facilitate the closing, nine days after the closing date had expired is evidence of the parties' written consent to extend the closing date. They must have known that the date specified in the contract had already expired. In this regard, we note that the contract specifies in section 13 that "time is of the essence of this contract...." and in section 17, that the "contract ... contains the entire and final agreement of the parties, and cannot be changed except by their written consent." Notwithstanding these provisions, the parties did not specify the manner in which the "written consent" had to be expressed. In other words, the parties did not specify that the written consent had to be affixed to the contract via an addendum to the contract. We find that the gift equity letter, executed nine days after the closing date had expired is sufficient evidence of the parties *1179 consent to change the closing date to some unspecified date in the future.
¶ 30. Since the parties did not specify a new closing date in the gift equity letter, the law would presume that the new date would have to be a reasonable one. Leach v. Tingle, 586 So.2d 799, 803 (Miss.1991). The evidence is that Mary did not want to close by the date specified in the contract because doing so would cause her to have to pay back the closing costs which had been waived by the bank when she procured the equity loan. According to Alan's testimony, the terms of the equity loan that Mary had made several months earlier provided that if it the loan was repaid within a year, the closing costs would be recouped by the bank. Alan further testified that because of the fast approaching holidays (Thanksgiving, Christmas, and New Year's Day), Mary decided to stay put and wait until the holidays had passed. We find that both the explanation for the delay and the date that ultimately was set for the closing (January 9, 2005) are reasonable in light of this testimony. This, of course, leads us to the final conclusion and finding that the parties consented in writing to change the closing date to some unspecified future date and that the date that ultimately was chosen was reasonable. Therefore, we hold that the original contract survived Mary's death and must be enforced in accordance with another provision of section 17, which provides that "this contract shall apply to and bind the heirs, executors, administrators, and assigns of the respective parties hereto."
¶ 31. THE JUDGMENT OF THE CHANCERY COURT OF HANCOCK COUNTY IS AFFIRMED IN PART, REVERSED AND RENDERED IN PART AND REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. ALL COSTS OF THIS APPEAL ARE ASSESSED ONE-HALF TO THE APPELLANTS AND ONE-HALF TO THE APPELLEES.
LEE AND MYERS, P.JJ., GRIFFIS, BARNES, ISHEE, ROBERTS AND MAXWELL, JJ., CONCUR. CARLTON, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY KING, C.J.
CARLTON, J., Concurring in Part, Dissenting in Part.
¶ 32. The closing date specified in the contract passed, but no closing occurred. Therefore, the contract expired by its own terms, and in my view, the contract was therefore unenforceable. I do not find the gift-equity letter sufficient in its terms to constitute an extension of the contract. Hence, I respectfully dissent as to the majority's affirmance of specific performance of the contract.
¶ 33. I do, however, agree with the majority that the gift-equity letter fails to constitute a completed inter vivos gift, since the equity in the home was never transferred to complete the asserted intended gift.
¶ 34. Therefore, I concur in part and dissent in part.
KING, C.J., Joins this Opinion.
NOTES
[1] The testimony revealed that the original documents were destroyed in Hurricane Katrina.
[2] The document signed by Mary regarding the home-equity line of credit with Keesler provides that: "If the [Home-Equity Line of Credit] amount under this `NO CLOSING COST' promotion is paid off within the first year of opening the plan, the member will be required to reimburse the credit union ALL of the closing costs that were paid on [her] behalf."
[3] Exhibit D is the contract.