ISHEE, J.,
 

 for the Court.
 

 ¶ 1. After administering the will of Ollie Mae Thomas (Ollie Mae), the executor, John D. Thomas, Jr. (John), filed a petition to close the Estate of Ollie Mae (Estate) and discharge the executor. In response, John’s sisters — Lynda Thomas Thoms (Lynda), Carol Thomas Deady (Carol), and Cathy Thomas May (Cathy) — filed a petition alleging maladministration of their mother’s estate and the family business, Gibson Products. John and his three sisters were the beneficiaries under the will. Following a hearing on the matter, the Chancery Court of Forrest County ruled in favor of the sisters.
 

 ¶ 2. The chancellor entered a judgment refusing to close the Estate and removing John as administrator for two trusts created by the decedent. Additionally, the chancellor ordered John’s interest in the Estate to be surcharged $267,477.41 for failing to account for the Estate’s assets. That amount included $142,000 that John spent for the real property contained in
 
 *630
 
 the Estate. Each of the three sisters was awarded $80,382.52 for the business, and they received attorney’s fees in the amount of $67,882.83.
 

 ¶ 3. Aggrieved by the judgment, John appeals. He asserts the following points of error: (1) whether the chancellor erred by refusing to approve John’s accounting, by refusing to close the Estate, and by allowing the litigation of corporate matters in the estate actions; and (2) whether the chancellor erred in surcharging John and entering a judgment against him and in favor of his sisters.
 

 FACTS AND PROCEDURAL HISTORY
 

 ¶ 4. The estate action in this case was initially commenced in 1999 following the death of Ollie Mae. The decedent left a will, which named John as executor, and John admitted the will to probate on July 13, 1999. The case was assigned to Chancellor Sebe Dale, Jr., but because he was unavailable at the time, Chancellor James Thomas, Jr., signed the decree admitting the will to probate and authorizing the issuance of letters testamentary to John. According to the provisions of the will, the decree waived the requirements of inventory, appraisal, and annual accounting.
 

 ¶ 5. The terms of the will directed that the decedent’s real property, which included a condominium in Destín, Florida, and a chalet in Gatlinburg, Tennessee, be placed in a trust along with $100,000 to operate and maintain the properties. John was named as the trustee of the trust. The residual property of the Estate was to be divided evenly among the decedent’s four children-Carol, Lynda, Cathy, and John. Lynda’s share was to be placed in the previously-created Lynda Thomas Thoms Trust, for which John also served as trustee. The will also contained an in terro-rem clause, which disinherited any beneficiary who challenged the will.
 

 ¶ 6. In addition to serving as executor of his mother’s estate and trustee of the aforementioned trusts, John was the sole officer, director, and employee of Gibson Products of Hattiesburg, Inc. — the family corporation. Stock ownership in the corporation was approximately twenty-six percent held by the Estate, nineteen percent held by John, and eighteen percent held by each of the three sisters. Besides voting his own shares, as executor and trustee, John was able to vote the shares controlled by the Estate and those controlled by Lynda’s trust. Therefore, John could effectively vote a majority of the stock in Gibson Products. His sisters pointed out that, at the Gibson Products directors’ meeting, of which John was the sole director, he voted himself a salary of $1,200 per month, which increased to $2,000 per month beginning on June 1, 2000.
 

 ¶ 7. From 1999 through 2005, John managed the Estate, the two trusts, and the family corporation. On November 17, 2005, he filed a Petition to Close Estate and Discharge Executor. Despite numerous letters from James Knight-the attorney that John had retained to assist him in closing the Estate, Carol and Lynda refused to assent to the closing. On May 8, 2006, Carol and Lynda filed a response to the petition to close the Estate. The chancellor found that the Estate was not ready to be closed and granted Carol and Lynda sixty days to file pleadings in the case. On August 17, 2006, Carol, Lynda, and Cathy filed a petition alleging maladministration of the Estate by John. Initially, Cathy had filed a Waiver of Process and Entry of Appearance, but she later revoked her assent to the Estate’s closing and joined her sisters’ petition. John again sought to close the Estate, but the chancellor re
 
 *631
 
 fused and ordered him to file an inventory and accounting.
 

 ¶ 8. After filing an inventory and accounting of the Estate, John filed a Petition for Approval of Inventory and Final Accounting and Discharge of Executor. Thereafter, Carol, Lynda, and Cathy filed a complaint against John individually, as executor, as trustee for both trusts, and in his capacity as president, secretary, treasurer, and sole director of Gibson Products. The complaint sought to (1) compel John to file a complete inventory and accounting, (2) remove John as trustee of the two trusts, (3) distribute the assets of the Estate under the court’s supervision, (4) impose liability upon John for damages caused by his breach of fiduciary duties, and (5) award attorney’s fees. John responded and requested that his sisters be disinherited from the decedent’s will pursuant to the in terrorem clause, and he also sought attorney’s fees.
 

 ¶ 9. A trial was held on the matter from October 16-17, 2007. John testified that the Estate consisted of various checking and investment accounts; real property in Florida, Tennessee, Alabama, and Mississippi; personal property; and stock in Gibson Products and in O.T. Properties, Inc. For his work on the Estate, the chancellor had approved two petitions filed by John seeking $8,881.25 and $16,932.50 in attorney’s fees. When he sought to close the Estate, he requested an additional $37,089 in attorney’s fees. He also requested $5,000 in attorney’s fees for Knight. At trial, John requested $78,699 in attorney’s fees for himself and an additional $55,574.89 for Knight. Additionally, John filed a petition with the chancery court in which he sought permission to sell the decedent’s homestead and her two automobiles. He sold the house, but he kept one of the cars and took it to Arkansas with him.
 

 ¶ 10. After hearing from the parties and attempting to reconcile John’s expenditures on behalf of the Estate with the accounting that he filed, the chancellor entered an order refusing to close Ollie Mae’s estate. The chancellor surcharged John $267,477.41. That amount included $142,000 that was spent in excess of the $100,000 set aside for the real property. The difference represented the amount for which the chancellor could not determine the purpose of the expense. As for the expenses that the chancellor could find were for the benefit of the Estate, the chancellor stated the following:
 

 The Court notes (a) that in 1999, there was a check written to Hulett-Winstead Funeral Home in the amount of $13,427.64, which the Court assumes was for funeral expenses; (b) that in 2000, there were four (4) checks written to the four (4) beneficiaries of the Estate in the amount of $25,000.00 each, which the Court assumes was a partial distribution from the Estate; (c) that in 2000, there was a check in the amount of $152,834.00 made payable to the Mississippi State Tax Commission; a check in the amount of $10,723.00 made payable to the Tennessee Department of Revenue; a check in the amount of $1[,]716.00 made payable to the Alabama Department of Revenue; the Court assumes these checks were for taxes related to the Estate[;] (d) that in 2001, there was a check payable to Thomas Law Firm in the amount of $16,932.50, which figure matches the amount authorized by the Court; (e) that in 2002, there was a check in the amount of $3,881.25 payable to Thomas Law Firm, which figure matches the amount authorized by the Court; (f) that in 2004, there were four (4) checks written to the four beneficiaries of the Estate in the amount of $100,000.00 each, which the Court assumes was a partial
 
 *632
 
 distribution from the Estate; (g) that in 2005, there were four (4) checks written to the beneficiaries of the Estate in the amount of $12,500.00 each, which the Court assumes was a partial distribution from the Estate; (h) in 2006, there were four (4) checks in the amount of $7,500.00 each written to the four (4) beneficiaries, which the Court assumes was a partial distribution from the Estate; and (i) that $100,000.00 of the Estate of Ollie M. Thomas was used to fund the Ollie Thomas Real Property Trust. The Court will not make further assumptions about the purpose of the remaining checks written on the Estate’s checking account given the complete incomprehensibility of the so-called accounting and the amount of time and the number of opportunities [John] had to prepare an accounting.
 

 ¶ 11. Finding that the sisters’ attorney essentially represented the Estate, the chancellor awarded the sisters the sum of $67,382.83 in attorney’s fees. The chancellor awarded $37,089 in attorney’s fees to John, an amount which had been agreed to by his sisters. For violating his duties as sole officer, director, and attorney for Gibson Products, the chancellor ordered John to pay each of his sisters the sum of $30,382.52. The chancellor also removed John as trustee of both trusts and prohibited him from spending any money from the Estate without court approval. From this judgment, John filed the present appeal.
 

 STANDARD OF REVIEW
 

 ¶ 12. Our review of a chancellor’s judgment is limited.
 
 In re Estate of Carter; Frazier v. Shackelford,
 
 912 So.2d 138, 143(¶ 18) (Miss.2005) (citing
 
 Miller v. Panned,
 
 815 So.2d 1117, 1119(¶ 9) (Miss.2002)). Generally, we will not disturb a chancellor’s findings unless the chancellor was manifestly wrong, clearly erroneous, or applied the wrong legal standard.
 
 Id.
 

 DISCUSSION
 

 ¶ 13. On appeal, John cites two alleged points of error. However, each of his allegations actually contains multiple issues, and we have divided them as such for clarity.
 

 I. The Accounting and Petition to Close the Estate
 

 ¶ 14. To begin, John argues that the chancellor erred by refusing to approve the inventory and accounting that he filed and by refusing to close the Estate. He makes a number of arguments in support of his position: (1) the chancellor had waived an accounting per the terms of the will; (2) the accounting filed by John was accurate and fully reflected all the disbursements from the Estate; (3) objections to the accounting were untimely; and (4) all issues with the accounting were addressed at trial.
 

 ¶ 15. Even though an accounting may be waived by a testator through the will, a chancellor has the power to nullify the waiver.
 
 Shackelford,
 
 912 So.2d at 146(¶ 26). “[T]he chancery court may require an accounting even when the testator has waived it where there are charges of mismanagement or maladministration of the estate.”
 
 Id.
 
 (quoting
 
 In re Estate of Hollaway; Hollaway v. Hollaway,
 
 631 So.2d 127, 134 (Miss.1993)). In
 
 Shackelford,
 
 the supreme court noted the broad equitable powers of the chancellor in ensuring that an executor properly exercises his fiduciary powers in administering the estate:
 

 According to Mississippi law, “one serving in the capacity of executor or administrator is an officer of the court and holds a fiduciary relationship to all parties having an interest in the estate.”
 
 Hollaway,
 
 631 So.2d at 133. Based on
 
 *633
 
 this relationship, Mississippi law provides a chancellor with broad equitable powers and encourages the imposition of regulatory measures which insure that an estate and the will of its owner are protected from fraud. It is therefore the distinct duty of a chancellor to hold those serving in positions of trust accountable for their administrative actions and, in this way, hold a fiduciary fully accountable for the property with which the fiduciary has been entrusted.
 

 Id.
 
 at 147(¶ 29). While
 
 Shackelford
 
 is not directly on point with the present case, we find the reasoning espoused by the supreme court to be applicable to the situation at hand.
 

 ¶ 16. The temporary chancellor initially waived an accounting of the Estate, which was an acceptable practice because the testator provided in her will that an accounting should be waived. However, after the sisters filed charges of maladministration, it was within the chancellor’s discretion to order a complete accounting. The supreme court has even stated that it is possible for a chancellor to reopen a closed estate upon charges of maladministration.
 
 Id.
 
 “[W]hen indicia of fraudulent activity are present, there is no legal barrier preventing a chancellor, clothed with the powers of equity, from reopening a closed estate and demanding a fiduciary to produce evidence in an effort to disprove maladministration.”
 
 Id.
 
 Accordingly, we find that the chancellor did not err in ordering John to provide an accounting.
 

 ¶ 17. As for the sufficiency of the accounting at issue, the chancellor repeatedly expressed his disapproval of the inadequate information that John had provided to the court. The accounting included a date, an amount spent, a check number, and a payee, but for the most part, it did not reflect the purpose of the transaction. Rule 6.05 of the Uniform Chancery Court Rules requires an accounting to include the purpose of any disbursement. The accounting by John did not reflect the purposes of the disbursements that he had made throughout the more than six years he served as executor. The attorneys attempted to go through the entire accounting with John in order to inform the chancellor of the purposes of the transactions. However, the questions were mostly limited to whether the transactions were for the benefit of the Estate or the real-property trust, and the actual purpose behind each transaction remained unclear. The supreme court has stated the following regarding the purpose of an accounting:
 

 An accounting is an important mechanism for the chancery court to employ in order to monitor the administration of an estate. Moreover, an accounting is an opportunity for an individual charged with the distribution of the assets of an estate to document and justify his/her lawful execution of the duties conferred upon him/her.
 

 Shackelford,
 
 912 So.2d at 146(¶ 26).
 

 ¶ 18. In the final judgment, the chancellor stated the following regarding the accounting:
 

 The Court has painstakingly gone through the so-called accounting filed by the Executor and the copies of the more than 1,200 checks written by the Executor on the Estate’s checking account, most of which contain nothing whatsoever on the “memo line.” The Court is asked by [John] to approve his so-called accounting, but to do so would be to approve the unknown; what was the money spent for and where did it come from. The Court cannot approve such an accounting.
 

 After reviewing the accounting submitted by John, we find no error with the chancellor’s determination that it was incomplete. It generally failed to disclose the purpose
 
 *634
 
 for the various expenses, and the testimony at trial did little to clear up that discrepancy.
 

 ¶ 19. We also see no merit to John’s arguments that the filing was untimely and that all the issues with the accounting were resolved when he gave his testimony concerning the accounting. First, John makes no allegation that the statute of limitations had expired on his sisters’ claim. He merely argues that his sisters did not file their claim for maladministration within the sixty days provided for by the chancellor. Second, the sisters made no stipulation that the items in the accounting were accurate or complete, and the chancellor repeatedly noted that John’s testimony did not resolve the issues with the accounting. It was for the chancellor to resolve those issues, and he did so in the final judgment.
 

 II. The Corporate Matters
 

 ¶ 20. Next, John takes issue with the fact that the chancellor allowed the litigation of corporate matters relating to John’s control of Gibson Products. He argues that it was not proper to litigate the corporate matters in an estate action. Instead, he argues that his sisters should have filed a shareholder derivative suit on behalf of Gibson Products. John relies on
 
 Bruno v. Southeastern Services, Inc.,
 
 385 So.2d 620, 622 (Miss.1980) to support his position. In
 
 Bruno,
 
 the supreme court stated:
 

 We adopt the rule in Mississippi that an action to redress injuries to a corporation, whether arising in contract or in tort cannot be maintained by a stockholder in his own name, but must be brought by the corporation because the action belongs to the corporation and not the individual stockholders whose rights are merely derivative.
 

 Id.
 

 ¶ 21. More recently, the supreme court has addressed this issue and decided that Mississippi would take the position that:
 

 [i]n the case of a closely held corporation ..., the [chancery] court in its discretion may treat an action raising derivative claims as a direct action, exempt it from those restrictions and defenses applicable only to derivative actions, and order an individual recovery, if it finds that to do so will not (i) unfairly expose the corporation or the defendants to a multiplicity of actions, (ii) materially prejudice the interests of creditors of the corporation, or (iii) interfere with a fair distribution of the recovery among all interested persons.
 

 Era Franchise Sys., Inc. v. Mathis,
 
 931 So.2d 1278, 1281(¶ 9) (Miss.2006) (quoting
 
 Derouen v. Murray,
 
 604 So.2d 1086, 1091 n. 2 (Miss.1992));
 
 see also Griffith v. Griffith,
 
 997 So.2d 218, 222(¶ 15) (Miss.Ct.App.2008).
 

 ¶ 22. Prior to trial, John filed a motion in limine requesting that the corporate matters be excluded from the estate action. In the order denying John’s motion in limine, the chancellor stated that he examined the issue and considered its ramifications. The chancellor found that:
 

 inasmuch as the said corporation is a part and property of this Estate, and further that the actions of John D. Thomas, Jr. as Executor herein, his actions as President and Sole Officer and Director of that corporation, and his actions as attorney for the Estate are so inextricably intertwined as to render it inefficient, impractical,] and contrary to equitable principles and judicial economy to effect separation of any or all his said actions into independent legal proceedings.
 

 The chancellor reiterated this finding in the final judgment and also noted that he considered the factors listed in
 
 Derouen.
 

 ¶ 23. All of the shareholders of Gibson Products were a party to the law
 
 *635
 
 suit, and there was no evidence that treating the sisters’ claim as a direct action would expose the corporation to a multiplicity of lawsuits or that it would prejudice the corporation’s creditors. Based on the chancellor’s consideration of the issue and in light of the fact that the supreme court has granted the chancellor discretion in deciding whether to treat such derivative actions as direct actions, we find that the chancellor was within his discretion in hearing issues relating to John’s management of Gibson Products. Accordingly, we find no merit to this issue.
 

 III. Surcharging the Executor
 

 ¶ 24. John’s argument concerning the amount he was surcharged can be broken down into two sub-issues: (1) the amount he was surcharged as a result of what the chancellor deemed to be an insufficient accounting and (2) the amount he was surcharged for expenses related to the upkeep of the real property.
 

 ¶ 25. The chancellor found that the court-approved expenses totaled $879,514.39, and the amount expended by John was $1,146,991.82. The chancellor found the difference in the amounts to be $267,477.41,
 
 [1]
 
 with $142,000 of that amount being the excess that John spent on the real property and the remaining amount representing estate expenditures for which John could not account.
 

 ¶ 26. John’s argument concerning the accounting is that his sisters suffered no prejudice as the result of his actions and that he should not be penalized for failing to strictly comply with the antiquated practice of filing vouchers with the accounting. Contrary to John’s argument, the chancellor did not penalize John for failing to file vouchers, as required by statute. The chancellor made it clear that the issue with John’s accounting was its incomplete nature — the fact that the purposes of the expenditures were not disclosed. When examining the accounting, the chancellor regarded it as “an accounting which does not tell me to whom the money was paid, for what purpose it was paid, and whether it’s an estate purpose or a personal purpose, or to a beggar on the street.” In the final judgment, the chancellor found that absent the filing of vouchers, “[pjlacing the style of the case and the cause number on the check, showing to whom paid
 
 and for what purpose
 
 the money was paid, the amount, and the date of the Court Order authorizing payment, would satisfy the substance, if not the form, of a statutory ‘voucher.’ ” The chancellor noted that John wrote more than 1,200 checks on the Estate’s account, which totaled more than $1,100,000, and only two of those — two payments of attorney’s fees to John — were approved by the court. Accordingly, we see no merit to John’s claim that the chancellor penalized him for failing to file vouchers.
 

 ¶27. Next, we address John’s argument concerning the real-property trust. He contends that he was protecting the assets of the Estate with his expenditures on the real property, and furthermore, the trust had not yet come into existence because it had not been funded. John cites
 
 Harper v. Harper,
 
 491 So.2d 189, 196 (Miss.1986) in support of his argument that the real-property trust did not come into existence. In
 
 Harper,
 
 the supreme court found that the testamentary trust did not come into existence because it had not been funded with a corpus, and the will did not grant the executor any authority to transfer estate property into the trust.
 
 Id.
 
 As the supreme court stated: “It is elementary that there can be no trust without a res, that there must be a definite subject matter.”
 
 Id.
 
 (quoting
 
 Warner v.
 
 
 *636
 

 Merchs. Bank & Trust Co.,
 
 2 Conn.App. 729, 483 A.2d 1107, 1110 (1984)). We find
 
 Harper
 
 distinguishable. In the present case, the trust was funded with real property in Florida and Tennessee and with $100,000 to maintain the properties.
 

 ¶ 28. Furthermore, as the chancellor found, John’s actions revealed that he believed that the trust had been activated. In the 2005 Petition to Close the Estate and Discharge Executor, John included as Exhibit H a Schedule of Remaining Trust Funds to Be Distributed by Estate. The schedule listed the funds expended on behalf of the real-property trust and calculated the funds that remained from the $100,000 that had been set aside.
 

 ¶ 29. At trial, John tallied the accounting figures and stipulated to the fact that he had spent $242,000 on maintaining the real property over the course of the Estate’s administration. This was clearly in excess of the $100,000 that the will provided to maintain the property. John argues that this figure is irrelevant and arbitrary in that the real-property trust never came into existence. However, we see nothing arbitrary about the figure when the will provided that $100,000 would be placed in the real-property trust for the maintenance of the trust’s property. Additionally, we have already found that the trust was funded with the real property and the $100,000. The trust provided $100,000 for maintenance of the real property. Without seeking court approval, John spent $242,000 for that purpose. We find no error with the chancellor surcharging him the difference in those amounts; therefore, this argument is without merit.
 

 IY. Attorney’s Fees
 

 ¶ 30. John next takes issue with the chancellor’s award of attorney’s fees to his sisters and the chancellor’s refusal to award attorney’s fees to John. He argues that the fees he requested were reasonable and were spent for the benefit of the Estate. He also argues that there was no authority allowing the chancellor to grant attorney’s fees to his sisters.
 

 ¶ 31. “Although attorney’s fees are the personal obligation of the administrator or executor, where they have benefit-ted the estate, they may be paid out of the estate as administration expenses.”
 
 In re Estate of Collins v. Collins,
 
 742 So.2d 147, 149(¶ 6) (Miss.Ct.App.1999) (citing
 
 Scott v. Hollingsworth,
 
 487 So.2d 811, 813 (Miss.1986)). However, “[if] the estate has not benefitted by those services, equity suggests that the estate should not pay for those services.”
 
 Id.
 
 In the present case, the chancellor found that John had breached fiduciary duties to his sisters and ma-ladministered his mother’s estate. The chancellor also found that: John refused to cooperate with his sister when she inquired, as was her right, into the Estate’s finances; John claimed to have spent an exorbitant amount of time creating an accounting that was unsatisfactory; and John unnecessarily hired Knight as a lawyer despite the fact that John had acted as the Estate’s attorney for more than six years. The chancellor did, however, award John the $37,089 in attorney's fees that his sisters had previously agreed for him to receive.
 

 ¶ 32. Ultimately, the chancellor concluded that the services of John and Knight were “not ‘proper and [not] rendered in good faith.’ ”
 
 See
 
 Miss.Code Ann. § 91-7-281 (Rev.2004). Supporting the chancellor’s refusal to award attorney’s fees was the finding that:
 

 In
 
 Estate of Carter,
 
 912 So.2d 138, 145 [ (¶ 23) ] (Miss.2005), the Mississippi Supreme Court described an executrix’s repeated failure to “provide [any] substantiation for the expenditure of a large portion of [the estate’s] assets” as a
 
 *637
 
 “monumental dereliction.” The failure of [John] in this case to provide “[any] substantiation for the expenditure of a large portion of [the estate’s] assets” rivals the dereliction in the
 
 Carter
 
 case. What makes it worse is that the Executor is
 
 an attorney,
 
 with an undergraduate degree
 
 in accounting
 
 together with
 
 two
 
 (2) law degrees: a J.D., and a Masters of Law in Taxation.
 

 Furthermore, the chancellor found that it was “patently unbelievable” that John spent almost sixty hours preparing such an inadequate accounting. We find this to be within the chancellor’s discretion, and we decline to disturb the chancellor’s ruling refusing John’s request for attorney’s fees.
 

 ¶ 33. As for the sisters’ attorney’s fees, the chancellor found that their attorney essentially had to act as attorney for the Estate and that equity required that the sisters be reimbursed for their attorney’s fees. According to the chancellor, John and Knight discouraged the sisters from asking questions concerning the Estate, and it was their lack of cooperation that forced the sisters to hire an attorney to ensure a proper handling of their mother’s estate. The chancellor noted that the sisters had no option but to hire an attorney in order to get John to disclose the details of their mother’s estate. In support of their request for attorney’s fees, the sisters offered the testimony of William Andrews, a local attorney, who testified that the bill for $67,382.83 was reasonable in light of the work done for the Estate.
 

 ¶ 34. In light of John’s lack of cooperation and the fact that the sisters had to hire their own attorney to get any answers about the Estate, we find no error with the chancellor’s decision to award them attorney’s fees. The supreme court has held that “even where there is no specific statutory authority for imposing sanctions, courts have an inherent power to protect the integrity of their processes, and may impose sanctions in order to do so.”
 
 Selleck v. S.F. Cockrell Trucking, Inc.,
 
 517 So.2d 558, 560 (Miss.1987) (citing
 
 Ladner v. Ladner,
 
 436 So.2d 1366, 1370 (Miss.1983)). The supreme court went on to state that “where a party’s intentional misconduct causes the opposing party to expend time and money needlessly, then attorney’s fees and expenses should be awarded to the wronged party.”
 
 Id.
 
 In the present case, there should have been no need for John’s sisters to hire an attorney to resolve the deficiencies in John’s accounting. Furthermore, John would have been entitled to attorney’s fees if his services and those of Knight had been rendered in good faith. Based on the foregoing, we find no error with the chancellor’s decision to award the sisters’ attorney’s fees. This issue is without merit.
 

 Y. In Terrorem Clause
 

 ¶ 35. In John’s last assignment of error, he argues that the chancellor erred in not enforcing the in terrorem clause contained in the will. It is John’s contention that his sisters violated the clause when they challenged his actions as executor; therefore, they should have been disinherited from the will. Article Four of the will reads as follows:
 

 If any Beneficiary hereunder shall protest the probate or validity of this Will or any provision thereof, or shall institute or join in (except as a party defendant) any proceeding to contest the validity of this Will or to prevent any provision thereof from being carried out in accordance with its terms (regardless of whether or not such proceedings are instituted in good faith and with probable cause), then all benefits provided for such Beneficiary are revoked and such benefits shall pass to the residuary Beneficiaries of this will (other than the persons joining in such contest) who are
 
 *638
 
 living at my death and who would have been distributees had I died intestate a resident of the State of Mississippi and had the person or persons contesting my will died immediately before me. Each benefit conferred herein is made on the condition precedent that the Beneficiary shall accept and agree to all of the provisions of this will and the provisions of this Article are an essential part of each and every benefit.
 

 ¶ 36. In the ruling on this issue, the chancellor concluded that the purpose of the above-quoted clause was “to discourage the beneficiaries from
 
 contesting the Will,
 
 not challenging the
 
 administration of
 
 the Estate or the Trusts-which is what Carol, Lynda[,] and Cathy’s Complaint does, and the Court
 
 so finds.”
 
 As the chancellor further noted, “[t]o hold otherwise, would mean that an Executor and/or a Trustee is free to spend a decedent’s money
 
 without accountability
 
 to anyone .... ” We find no error with this holding, and we find that the chancellor properly refused to apply the in terrorem clause. Therefore, this issue is without merit.
 

 ¶ 37. THE JUDGMENT OF THE CHANCERY COURT OF FORREST COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
 

 KING, C.J., LEE AND MYERS, P.JJ., IRVING, BARNES, ROBERTS, AND MAXWELL, JJ., CONCUR. CARLTON, J., CONCURS IN RESULT ONLY. GRIFFIS, J., NOT PARTICIPATING.
 

 [1]
 

 . The difference in the amounts actually comes out be $267,477.43