# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2017-CA-01627-COA

IN THE MATTER OF THE ESTATE OF                                    APPELLANT
DOROTHEA KOLF, DECEASED:
PETER A. KOLF

v.

STAN AUTHEMENT, EXECUTOR                                          APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 11/16/2017 |
| TRIAL JUDGE: | HON. SANFORD R. STECKLER |
| COURT FROM WHICH APPEALED: | HANCOCK COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | MICHAEL JOSEPH YENTZEN |
| ATTORNEY FOR APPELLEE: | CLEMENT S. BENVENUTTI |
| NATURE OF THE CASE: | CIVIL - WILLS, TRUSTS, AND ESTATES |
| DISPOSITION: | AFFIRMED IN PART; REVERSED AND RENDERED IN PART - 10/22/2019 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

### BEFORE BARNES, C.J., GREENLEE AND LAWRENCE, JJ.

### BARNES, C.J., FOR THE COURT:

¶1. Peter and Dorothea Kolf were married on June 14, 2008. The couple executed a premarital agreement (Agreement), indicating their intent to keep assets acquired prior to marriage as separate property. The Agreement also provided that the couple would maintain a joint account for their living expenses. The couple established two joint accounts—one at The First Bank and one at Hancock Bank. Dorothea's income (her social security and pension) went into The First Bank account; Peter's income went into the Hancock Bank account. Dorothea also had an individual savings account with Keesler Credit Union (Keesler). On August 7, 2008, Dorothea executed a durable power of attorney appointing

Peter as her attorney-in-fact for financial purposes.

¶2. Dorothea was diagnosed with lung cancer in March 2016. In May 2016, she discontinued chemotherapy treatment and began hospice care. Peter withdrew $5,000 from Dorothea's Fidelity Investments (Fidelity) IRA in June 2016 and another $20,000 in August 2016, reportedly because Dorothea had recently turned 70½ and was required to take a minimum required distribution (MRD) under the IRA's terms. Of the money withdrawn, $15,500 was deposited into the joint account at The First Bank; the remaining $9,500 went to the Internal Revenue Service (IRS) for taxes.[1] Peter did transfer $3,250 from the first MRD to Dorothea's Keesler account in June 2016.

¶3. Dorothea died on September 3, 2016, and her son, Stan Authement, was appointed as executor under the terms of her will shortly thereafter. Authement filed a motion to compel the return of estate assets and other relief with the Hancock County Chancery Court on November 8, 2016, asserting that the IRA funds transferred to the joint account at The First Bank belonged to the estate, not Peter, and requesting that Peter provide an inventory of all estate assets from Dorothea's home.[2] The motion also contended certain personal property—a diamond ring that had belonged to Peter's first wife and new home appliances—constituted gifts to Dorothea from Peter and were, therefore, estate assets. On January 12, 2017, Peter filed a probate claim, requesting $4,219 for funds expended for

[1] $1,750 of the $5,000 distribution went to federal tax withholding; $7,750 was withdrawn for federal taxes in August 2016.

[2] Because Dorothea owned the residence prior to marriage, there is no dispute that this was not marital property. Under the terms of her will, Peter was allowed to occupy the home for up to two years after her death, but he vacated the home in December 2016.

2

Dorothea's funeral expenses. He also filed an estate accounting.

¶4. On March 24, 2017, the chancery court entered an "Order Freezing Assets of Estate, Compelling Inventory and Accounting and Other Relief," nunc pro tunc to January 23, 2017. The order required Peter to provide an accounting of all funds held or expended from The First Bank account from January 1, 2016, to the date of the accounting. Although the order prohibited Peter from filing a joint tax return for 2016, he did file a joint tax return on March 5, 2017; so Authement filed a motion for contempt on May 17, 2017, and a motion for attorney's fees.

¶5. Hearings were held on June 15, 2017, and September 14, 2017. On June 29, 2017, the chancery court ordered that the funds in the Keesler savings account be distributed to the account's beneficiary, Stephanie Skojac, Dorothea's daughter.

¶6. The chancery court entered a final judgment on November 16, 2017, that Dorothea lacked the capacity to make informed decisions after May 1, 2016. Therefore, the IRA funds ($25,000) withdrawn from Dorothea's IRA account "must be returned" to the estate, minus $8,511.37 in legitimate expenditures, for a total award of $16,488.63 to Dorothea's estate. The chancery court also held that the diamond ring and the appliances were part of the estate. Because Peter was found in contempt for filing the 2016 tax return, he was ordered to pay $900 in attorney's fees for the contempt, as well as one-half of Authement's attorney's fees ($5,240.50) "resulting from his wrongful acts in depriving the estate of estate assets." Peter appeals the judgment. Finding the court erred in failing to award Peter credit for monies he transferred to Dorothea's Keesler account, we reverse and render in part, but affirm in all

3

other respects.

**STANDARD OF REVIEW**

¶7.     Our review of a chancery court's judgment is limited. *Whitley v. Love* (*In re Estate of Whitley*), 129 So. 3d 260, 262 (¶5) (Miss. Ct. App. 2013) (citing *Howard v. Gunnell*, 63 So. 3d 589, 597 (¶16) (Miss. Ct. App. 2011)). We will not disturb the chancery court's decision on appeal absent a finding that the court was "manifestly wrong, clearly erroneous, or the [court] applied an erroneous legal standard." *Id*. Questions of law, however, are reviewed de novo. *Id*. (citing *Rousseau v. Rousseau*, 910 So. 2d 1214, 1217 (¶8) (Miss. Ct. App. 2005)).

**DISCUSSION**

**I.      Whether the chancery court erred in awarding the Appellee the IRA funds from The First Bank joint account.**

*A.      Dorothea's Ability to Give Informed Consent*

¶8.     Peter argues that the chancery court erred in finding "that any and all acts by Dorothea after May 1, 2016, were a nullity" due to her "mental and physical weaknesses" from the cancer and medication.[3] He notes there was no expert testimony regarding her state of mind and contends that the evidence does not support the court's finding.

¶9.     We agree there is no substantial evidence supporting the court's determination that Dorothea lacked the ability to make informed decisions after May 1, 2016. Peter testified that it was not until August that Dorothea was not fully aware of what was going on:

---

[3] The testimony was that Dorothea was on Fentanyl, Percocet, and Vicodin for pain management.

4

Q. So beginning in May, what kind of – so beginning in May, she was unable to give informed consent about her own medical care?

A. In May is when she informed the doctor that she no longer wanted chemo.

Q. All right. Well, my question was related to – to your knowledge, when was it, if ever, that she was unable to give informed consent about her own medical care?

A. I think during the period from May on. Now, she did make some statements that, you know, what she wanted. For instance, when she was in pain, she wanted medication and things like that. When she had to go to the bathroom, she indicated she had to go to the bathroom and things like that.

Q. All right. Specifically what I'm trying to explore with you is, was there a period of time that because of either her illness, weakness[,] or medication that she was not a person who, in your opinion, was totally in control of what was going on in her life?

A. I think towards the end, *maybe in late August* and that up until the time she died, she was incoherent at some times. She wasn't awake. *But before that time, like in June and July and parts of August and things like that, she was*[,] *I think* [,] *fully aware of what was going on with herself.*

(Emphasis added). Dorothea's daughter, Tina Coghlan, moved into the couple's residence in August 2016 to help care for her mother. She corroborated Peter's testimony, stating: "In the beginning she was – she had her mind. It wasn't until later on, *toward the end of July*, you know. . . . You know, so it wasn't all the time, but she was getting confused." (Emphasis added). She said that on Dorothea's birthday, August 12, Dorothea was very tired but knew everyone who was there at her house. Moreover, the evidence showed that Dorothea was writing checks out of The First Bank account in May and June 2016.

¶10.   However, this error does not warrant reversal of the court's ruling that the estate was

entitled to Dorothea's IRA funds because the chancery court did not rely on a presumption of undue influence resulting from a fiduciary relationship in making its determination that the IRA funds should be returned to the estate. The court concluded that Authement had proved by clear and convincing evidence that Peter "acted without consultation with [Dorothea] and in a manner contrary to the parties Prenuptial Agreement." Neither party disputes that the Agreement was valid and enforceable. Dorothea's IRA account was her separate property under the Agreement's terms. The 401K was listed on Exhibit B as Dorothea's separate property. Nothing in the Agreement provided Peter with the authority to claim ownership of those funds. There was also no credible evidence that Dorothea gave Peter consent to withdraw her IRA funds, a separate asset, and deposit them into their joint account. There was testimony by Coghlan and Authement that Dorothea was unhappy when she discovered that Peter had taken the MRD from her Fidelity account. According to Coghlan, she contacted Fidelity for Dorothea, who personally told Fidelity to "lock" the account.

¶11. Accordingly, we find no abuse of discretion in the chancellor's finding that Peter acted "unilaterally" in transferring the funds, and the IRA monies deposited into the joint account at The First Bank would become the estate's property.

### B. Power of Attorney

¶12. Alternatively, Peter argues that he had authority under the general power of attorney (POA) to withdraw the IRA funds. As stated, Dorothea executed the POA on August 7, 2008, naming Peter as her attorney-in-fact for financial purposes. The POA granted Peter

"full authority to handle, in his exclusive discretion, all matters and things [in] which [Dorothea] may be interested, either business or personal affairs."

¶13. The issue before us on appeal is whether the chancery court erred in awarding the IRA funds to Dorothea's estate. Because the funds were Dorothea's separate property under the terms of the Agreement, thereby making them a future estate asset, any authority that Peter may or may not have had to withdraw those funds under the POA is irrelevant. Moreover, an agent's authority under a POA "does not permit the attorney-in-fact to engage in undisclosed, self-dealing activities." *West v. Johnston* (*In re Estate of Johnson*), 237 So. 3d 698, 707 (¶23) (Miss. 2017).

> "It is fundamental law that an agent owes his principal absolute good faith and fidelity, and he cannot in the exercise of his authority as agent acquire property or interest therein rightfully belonging to his principal without full disclosure and free consent of his principal." *McKinney v. King*, 498 So. 2d 387, 388 (Miss. 1986). If disputed, the attorney-in-fact's actions must be shown to be within the principal's intent when granting the power of attorney, in the best interests and for the benefit of the principal, and in accord with the duty of good faith owed by the attorney-in-fact to the principal. Any property or interest obtained in violation of the attorney-in-fact's fiduciary duty "thereby is voidable by, and may be set aside by the principal or his estate." *Id*.

*In re Estate of Johnson*, 237 So. 2d at 707 (¶22). There was substantial evidence that the transfer of the IRA funds was not done with Dorothea's "free consent."

## II. Whether the chancery court erred in failing to give Peter credit for certain expenditures made from The First Bank account.

¶14. The chancery court ordered Peter to reimburse the estate $16,488.63 "of the funds he withdrew from Dorothea's IRA." This award was later reduced to $11,281 after Peter paid the estate $5,207.63, which was the amount ordered by the court to reimburse the estate for

7

the tax refund.[4] Peter claims that the chancery court failed to credit him with an additional $6,493.31 in expenditures for "medical expenses, funeral expenses[,] or payments to Dorothea and her heirs."

¶15.    Authement argues that these expenditures were paid from The First Bank joint account, which derived income from Dorothea's IRA funds and her Social Security and pension income. Thus, the estate, in effect, paid for these expenses. We agree with one notable exception—the $3,250 in IRA funds that Peter transferred from The First Bank account to Dorothea's Keesler savings account in June 2016. Peter testified that Dorothea was aware of that transaction, and he transferred the money to the Keesler account under her direction. Coghlan also admitted that she and Dorothea "knew about the June transaction." Furthermore, Authement has not attempted to mitigate damages by asserting any claim to those funds from Skojac, the beneficiary of the Keesler account. *See Rolison v. Fryar*, 204 So. 3d 725, 736 (¶26) (Miss. 2016) ("An injured party has a duty to take reasonable steps to mitigate damages.") Counsel for Authement, in fact, stated during a hearing that the money in the Keesler account was "not the estate's money" and asked the court to release the freeze on the account. Therefore, we reverse and render the judgment in part to reflect the $3,250 credit.

### III.    Whether the chancery court erred in awarding the estate the diamond ring and the appliances.

¶16.    Peter claims that his former wife's diamond ring was not a gift to Dorothea, noting

---

[4] The chancery court determined that Dorothea's tax burden on her income would be $4,292.37; so the estate would be entitled to $5,207.63 ($9,500 in prepaid tax minus $4,292.37).

that the Agreement stated the parties' property prior to marriage would remain separate. Peter said Dorothea never wore the ring. He testified: "The ring, that belonged to my second wife, Iris, and that as far as I'm concerned always belonged to me." Peter also maintains that the new appliances he bought for the house (double oven, microwave, cooktop, refrigerator, washing machine, and a dryer) were not gifts to Dorothea. He took them out of the residence after her death and replaced them with appliances of lesser value.

¶17.    In *Lagarde v. Lagarde*, 33 So. 3d 1169, 1173 (¶15) (Miss. Ct. App. 2009), we held:

> In Mississippi, the requirements of a valid inter vivos gift are: (1) that the donor be capable of making the gift, (2) that the act is voluntary on the donor's part, (3) that the donor intends to make the gift, (4) that the gift is complete with nothing left to be done, (5) that the property be delivered by the donor and accepted by the donee, and (6) that the gift be gratuitous and irrevocable. *Jenkins v. Jenkins*, 278 So. 2d 446, 449 (Miss. 1973).

According to Coghlan, Dorothea had said that Peter "gave" her the ring, and "[s]he wore it a lot, especially for special occasions when she dressed up or when they went to events." Authement stated that Dorothea wore the ring early in the marriage and kept it in her personal jewelry box. Coghlan also related comments Peter made after the new microwave and double oven were installed, testifying: "[T]hat's going to be her Christmas present and her anniversary present and all these – you know, because apparently they spent a lot of money on the double oven and the microwave, and so he said that was all her presents." Authement also testified:

> I know that as my mother wanted to upgrade [the appliances], Pete would buy her new appliances and it was always a gift. And he bragged to all of us that what a great guy he was, he was buying my mother – purchasing my mother a new refrigerator or a new washer and dryer. Whatever he bought her, he bragged to everybody about what a nice gift it was, what a great gift. He

9

bought the new kitchen appliances for use in the home, which Dorothea owned.

¶18. "[T]he chancellor, as the trier of fact, is the judge of the credibility of the witnesses and the weight of their testimony, as well as the interpretation of evidence where it is capable of more than one reasonable interpretation." *Mayton v. Oliver*, 247 So. 3d 312, 322 (¶34) (Miss. Ct. App. 2017) (quoting *Bowen v. Bowen*, 982 So. 2d 385, 395 (¶42) (Miss. 2008)). We find no error in the chancellor's finding that the ring and the appliances were gifts and, therefore, the property of the estate.

## IV. Whether the chancery court erred awarding Authement one-half of his attorney's fees.

¶19. Peter contends that the chancery court's award to Authement of one-half of his attorney's fees in the amount of $5,240.50 is an abuse of discretion because there was no evidence of wrongdoing on his part.[5]

¶20. The IRA funds withdrawn by Peter and deposited into his and Dorothea's joint account were a misappropriation of her separate assets under the Agreement's terms, requiring Authement to institute legal proceedings. "[W]here a party's intentional misconduct causes the opposing party to expend time and money needlessly, then attorney's fees and expenses should be awarded to the wronged party." *Thomas v. Thomas* (*In re Estate of Thomas*), 28 So. 3d 627, 637 (¶34) (Miss. Ct. App. 2009). However, the chancery court did recognize that "there were some legitimate disputes between the parties," which is why he only awarded half of the attorney's fees. We find no abuse of discretion in the awarding

_____

[5] He does not challenge the court's award of $900 in attorney's fees for contempt.

of attorney's fees by the chancery court.

## CONCLUSION

¶21. Accordingly, we affirm the chancery court's judgment awarding the estate the diamond ring, appliances, and one-half of its attorney's fees. However, finding the court erred in failing to credit Peter for the $3,250 in IRA funds transferred to the Keesler account, we reverse and render in part, modifying the judgment awarded by the chancery court to $13,238.63.[6]

¶22. **AFFIRMED IN PART; REVERSED AND RENDERED IN PART.**

**CARLTON, P.J., GREENLEE, WESTBROOKS, McDONALD, McCARTY AND C. WILSON, JJ., CONCUR. J. WILSON, P.J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. LAWRENCE, J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION. TINDELL, J., NOT PARTICIPATING.**

---

[6] This modified award does not reflect the $5,207.63 that Peter has already paid to the Appellee. Taking that payment into account, the amount owed to the Appellee is $8,031.